MORSE, CAMPBELL, and LONG, JJ., concurred.

SHERWOOD, C. J.   I concur in the result.

———————

WILLIAM CAMPBELL ET AL. V. DANIEL CAMPBELL ET AL.

*Disposition of property by parent—Undue influence.*

1. While natural justice would seem to call for an equal division of property between children, yet the Court cannot be insensible to the *absolute* right of a parent to dispose of his property in such manner as he sees fit, he being most capable of determining which of such children are most deserving, in his estimation; and the Court has no right to substitute its will or wishes, or ideas of what is just and right, for his.

2. On a review of the testimony, the decree is affirmed; and, the case being one involving questions of fact solely, reference is had to the opinion for further information.

Appeal from St. Clair. (Canfield, J.)   Argued April 5, 1889.   Decided June 7, 1889.

Bill to set aside a deed for fraud and undue influence. Complainants appeal from decree dismissing bill.   Affirmed. The facts are stated in the opinion.

*F. A. Baker,* for complainants.

*E. G. Stevenson* (*William P. Wells*, of counsel), for defendants.

CHAMPLIN, J.   Robert Campbell died September 25, 1883, leaving 11 children surviving him.

The complainants are seven of the 11 children, who file their bill of complaint against four of the children and one George S. Granger to set aside a deed executed by Robert Campbell in his life-time, on the thirtieth of August, 1883, of 160 acres of land in the town of Columbus, St. Clair county, Michigan, to his son Daniel Campbell.

The consideration expressed in the deed is $4,000, but the real consideration was an agreement for the care, support, and maintenance of the grantor, which was evidenced by a writing executed cotemporaneously with the deed by the grantee, as follows:

"I, Daniel Campbell, of the city of Detroit, for and in consideration of a warranty deed to me made and delivered of the south-east quarter of section seventeen, of Columbus, by Robert Campbell, my father, do agree to take him, the said Robert Campbell, into my family, and furnish him with all food, clothing, and medical attendance during his natural life, or so long as he may live, in a manner suitable to his station in life; and I do agree that the said land shall be deemed and held liable to said Robert Campbell for said support.

"Dated this thirtieth day of August, 1883.

"In presence of—                    DANIEL CAMPBELL.
    "G. S. Granger.
    "Alexander Grant."

The complainants charge that said deed was obtained by the said Daniel Campbell fraudulently, for the purpose of cheating the other children and heirs of Robert Campbell out of their shares in his estate, said Daniel well knowing that his father was not competent to execute a deed, by representing to him that his other children, and particularly the complainants, had either stolen from him, or been instrumental in his losing, $1,400 in money, and that they had no regard or love for him, and would do nothing to take care of him in his illness and old age,—all of which representations and pretenses were false and fraudulent; that the deed was obtained by artifice and deception practiced by defendants

upon Robert Campbell by undue influence; and that the consideration for the conveyance was utterly inadequate and insufficient, and the whole transaction was unconscionable and fraudulent.

We have given the testimony introduced in support of these charges due and careful consideration. It covers the history of the family of Robert Campbell, the father, from the time he left Canada and took up his residence in Columbus upon the farm in question,—a period of more than thirty years.

We gather from the testimony that Robert Campbell was a man possessed of a strong self-will, opinionated, obstinate, and of an irascible, ungovernable temper. His likes and dislikes were strong, and his conduct was liable to be influenced by his prejudices. When not in the heat of passion, he was kind-hearted and affectionate towards his family. He was one of those men who insisted that his word was law in his family, and disobedience in his opinion merited, and usually received, condign punishment, promptly administered.

I do not doubt, and the testimony tends to show, that the children inherited some of the obstinacy of the parent, and the matter of rearing so large a family was a task of some difficulty, even with a considerate and judicious parent.

That there were times when he misused and abused his wife and children during the 30 years he lived in Michigan, before his second wife died, there can be no controversy. The incidents of such abusive conduct have been detailed by his children, now contesting for his property, with painful particularity; and yet, taking the sum total of all the occurrences narrated, they make an insignificant fraction of the 30 years of the home life of Robert Campbell.

Some of the children left home of their own accord, and others were driven away by their father in the heat of passion, because they did not obey his behests.

The second wife of Mr. Campbell died in the spring of

1877. Joseph, the youngest child by the first wife, had died a few days before the step-mother, and up to the time of his death there were living eight children by the first and four by the second wife.

Up to the time of the death of the second wife, Robert Campbell exhibited no partiality for one of his children more than another. They were all treated alike. It is claimed by complainants that defendant Daniel was maltreated and driven away from home years before this time, and was living in Detroit. John had been driven away because "he would not pick his goose;" Sarah, because she insisted upon keeping company with a young man after her father had forbidden her to do so. All of the others left home voluntarily. There is some conflict of testimony as to whether Hugh and Catherine were driven away, or left home of their own accord, but, under all the circumstances, I think they left voluntarily, and against the wishes of their father.

There does not seem to have been the best of feeling between the children and their father, or between the children themselves. If we give credence to the testimony of the children, there were plots and counterplots to obtain from the father his property.

It is charged that Daniel endeavored to induce some of his brothers of the first wife's children to join him in the effort, before the death of the second wife, to obtain a deed of the farm; giving as a reason that the second wife would influence their father to make the property over to her, and then her children would get the whole of it.

It is charged by Daniel that his brothers approached him with the proposition to have a guardian appointed over their father, on the ground that he was incapable of taking care of his property, and was disposing of it at a great sacrifice; while it is charged by William and George that Daniel tried to have them join him in sending his father to an insane asylum on the ground that he was crazy.

They also claim that Daniel took every occasion to preju-

dice the mind of their father against the other children, and represented them to their father as stealing from him, and trying to get his property.

In the spring of 1877, all the children above 21 years of age had left home, leaving Robert Campbell and his wife upon the farm with the children, Sarah, aged about 21, Catherine, 14, and Hugh, 10 years, remaining in the family. Robert Campbell was then about 62 years of age. Samuel was working at a neighbor's. John was living on a farm nearly opposite the land in question. William, Daniel, George, and Joseph were living at Detroit. Nancy was married, and living in Canada. The testimony does not show the whereabouts of Robert and Archibald at that time.

It is claimed that many years prior to 1877 an amicable arrangement had been entered into between Robert Campbell and his wife; that she was to have the avails of the butter and eggs produced upon the place, and Mr. Campbell was to have the avails of the stock and farm produce. There is also testimony tending to show that Mr. Campbell intrusted his wife with the care and keeping of the money received by him, and that it was the purpose of the parties to apply the accumulations thus made in building a new house upon the farm; the house they had occupied in rearing their family being a log house. It is claimed that Mrs. Campbell had in her possession quite a sum of money, which she guarded with jealous care, sometimes secreting it in one place and then in another; the amount at the time of her death being, as claimed by the complainants, a little over $800, and, as claimed by Robert Campbell in his life-time, over $1,400.

In the month of April, 1877, William Campbell was taken sick. The disease proved to be the small-pox. Joseph, who was boarding with him, was taken with the disease. His step-mother came to care for him. Joseph died, and Mrs. Campbell was also taken sick, and died at William's house on May 2, 1877. During her illness she called George to the

window, and instructed him to go to the farm, and get from Sarah, in whose care she had left it, the money, and divide it equally among her four children. George did as requested. Complainants claim that this money was solely the avils of the butter and eggs, and belonged exclusively to Mrs. Campbell.

Robert Campbell in his life-time, without reference to the source from whence it was derived, claimed that the money was his, and that the children had no right to it. He charged his children with having stolen it from him, and evidently felt that a great wrong had been perpetrated upon him. He charged William with having instigated it, and George and Sarah with having done it. If he believed that it was money which they had laid aside for the purpose of building a house to the amount of $1,400, or over, more or less of it the avails of his savings from the sale of stock and produce, he had cause for feeling aggrieved over the transaction.

By the death of his wife he was left with the three children above named, but George went back in the early part of May, and made some arrangements about working the place on shares. In July, Sarah left, and a little later George had some dispute with his father, and was ordered off the place, and Catherine and Hugh left at the same time. These children went to Detroit, and stopped, a portion of the time with Daniel, who lived at Springwells, and a portion of the time with William. It appears that Mr. Campbell made efforts to get Catherine and Hugh to return to him, and also one and another of the unmarried boys to come and live with him, offering to let them work the place. It appears that Archibald would not do it unless he would make a deed of the place to Archibald or Daniel, and Samuel would not do it, and gave no reason for refusal.

Several letters were put in evidence to show that Daniel was endeavoring to prejudice the mind of his father against complainants, and especially against William, viz. :

"SPRINGWELLS, September 20, 1877.

"*Dear Father*: I am very sorry I have no influence over the children in regard to having them go home. I was there to-day, and they said they would not go home. Perhaps if you come after them yourself they will go home, for I think they are influenced by the older ones not to go, and my opinion of William sending for them is only a put-up game to collect board from you. You want to look out for yourself, for if there is such a thing to be got he will get it. Don't let him get the start of you. Hugh is starting going to school. Sam is here. You might as well give up all hopes of them coming home, and give up the idea of staying there all winter; but write as soon as you get this, and let me know if you are coming down after them or not. I can't think of no more at present.

"From your affectionate son,

"DANIEL CAMPBELL."

"October 1, 1877.

"*Dear Father:* I received your kind letter, and was glad to hear from you. We are all well, hoping that this will find you the same. There is nothing new here, at least that I know of. William and George passes me on the street, and don't speak to me. I heard that Katy has been sick, but she is better now. I heard Sarah was going to get married this week to Brophy. They have got the money for Sarah, and George said they had it, and they would like to see you get it, for it never belonged to you.

"Now, father, there is no use of your feeling bad about what's gone, but use what you have left, for William has said he would get more for them  So look out for him, for if there is any way he will. Write soon, and let me know what you think of doing, for it is impossible for you to stay alone there all the time, and you had better come down and see us any way. If you can't stay very long, it will do you good to have a rest. Please write, and let us know what you think of doing. Write soon, for I am anxious to hear from you.                    From your loving son,

"D. CAMPBELL.

"Direct, Mr. D. Campbell, Detroit, care P. Jewell & Sons, Mich."

"SPRINGWELLS, December 20, 1877.

"*Dear Father:* I now take the pleasure of writing you a few lines to let you know we are all well. When I got home that night Sam was at the house. He was telling Jessy she

need not look for me home before Thursday, for he was sure I would be in Port Huron Monday, getting a deed of the place. So he waited Monday to see if I got back. I went up town last night to see what I could learn. I heard that they had Robert posted on the matter, and received letters very often from him, and that they meant business. I heard that they had been to Lawyer Minock's, but didn't learn for what purpose, but the will business had been talked over before by them long before I knew anything about it. I heard that William knew all about the children leaving home before ever they came to Detroit.

"People there are talking about it not being safe for you to be living there alone. I have talked the matter all over with Jessy, and she is quite willing to do what you think is best. If you don't think of coming to Detroit to stay, that you have been there long enough alone, for it is a terrible heartless looking thing for you to be living there alone. No more at present.          From your affectionate son,

"DANIEL CAMPBELL.

" Write me soon, and let me know how things is."

"OFFICE OF DETROIT LEATHER COMPANY,   )
      "DETROIT, MICH., September 13, 1881. (

" *Dear Father:* I thought I would write you a few lines, and let you know that I will be up next week to get one or two horses. How is the mares looking? Do you want to sell them? If so, let me know, and if they will drive in the buggy, and if you have took the colts from them yet. If I bought them, we would want to drive them right away. So if you think of selling, fit them up a little. We are all well at present.

" Archibald Campbell was down to see us not long ago, but he had poor luck with Katy, trying to have her go home. He got a cool reception at Will's and George's. I have not heard from him since he left. No more at present. Answer this by return of mail.

" From your affectionate son,

"D. CAMPBELL."

Also a letter from Archibald Campbell, bearing date August 10, without naming the year; but, from the reference in the preceding letter to Archibald's visit and efforts to get the children to return home, it is likely that it was written in 1881. It reads as follows:

"LUDINGTON, August 10.

"*Dear Father:* I thought I would write a few lines to let you know that I reached here all right. I have talked with my sister about going home, but it is of no use, because her brothers has their influence over her, and it is of no use to try to get her to go home, for they want nothing but the farm, and if they get any chance they will try to get it, and they will turn you out if they possibly can, and I think that the best thing you can do is to get your property fixed so they can't get any hold on it, for Will says he shall get it if he can, and I think you have enough of it now. Kate says that she is going to sue for her share before long, and I think she has got her share now, the way she has done.

"Father, I can't see no object in going home excepting you make it an object for me, because if anything should happen you they would put me off of the farm. I would be my labor out and get nothing for it; but, if you will make the property over to me or Dan, you will have the handling of the farm while you live, and then I will receive something for my labor, for my object is to keep it away from them; and if you will do that I will come home and stay with you, for I don't want to see you live there alone. I think something will happen you if you are left there alone, dear father. That is for this time. Please answer as soon as possible, and let me know what you will do.

"ARCHIE CAMPBELL.
"Direct to me at Ludington, Mason County."

Daniel testified that the first time his father talked with him about deeding the place to him was in 1877; that he sent for him to come up to the farm, and wanted to deed the property to him; that he told him he did not want it; that the next spring he went up there, and he talked of drawing up a deed then, and for him to move up there, and he told him that he didn't care about it.

It appears from the testimony that in the summer of 1883 a fatal malady had developed in the mouth and throat of Mr. Campbell. He had advised with local physicians, who advised him to consult Dr. McGraw, of Detroit. Accordingly in August he, in company with a neighbor, Mr. Grant, went to Detroit, and visited Dr. McGraw, who advised him that he was afflicted with a cancer, and that it was incurable. Mr.

Grant testifies that the doctor told him that he would live but a short time. At Mr. Campbell's suggestion they then went to see his son Daniel, whom he wished to come and take care of him, and he would deed him the place. It was finally arranged that he should come up to Columbus the next day. He did not go, however, until the next day but one, when the deed and agreement to support were executed. There was no secret with reference to the determination of Mr. Campbell to deed the land to Daniel. Hugh was there, and he was informed of it.

So far as the capacity of Robert Campbell is concerned in this investigation, I think he was both physically and mentally competent to transact the business done upon that day. He was not crazy or weak-minded. Had the transaction been between strangers, and the defendant occupied the position of a mere purchaser, the consideration would have been grossly inadequate. The premises conveyed were worth at least $30 an acre. But here the transaction was between parent and child, made in contemplation of approaching dissolution, and under circumstances which partook very much of the character of a testamentary disposition of the farm. It is in testimony that he had often said he intended to give the farm to Daniel, and if the transaction cannot be impeached for fraud, or undue influence, which is a species of fraud, it must stand. If otherwise valid, the delivery of the deed was sufficient, and passed the title.

The question of undue influence is the only one upon which we have had any doubt. We cannot approach the question without being sensible to the influence that natural justice would call for an equal division of the property among all the children, share and share alike. This would be the case where all are alike deserving. But we must not be insensible to the absolute right which a parent has to dispose of his property in such manner as he sees fit; that he is most capable of determining which of his children are most deserving in his

estimation, and that we have no right to substitute our will or wishes, or our ideas of what is just and right, for his.

It is plain from the testimony that there existed a feeling of mutual jealousy between Daniel and William. It appears that Daniel had taken his father's side, or at least sympathized with him, in reference to his position over the money which was taken away by George, and also from the children leaving their father, and refusing to return to their home. It is equally obvious that William sided with the children, and against the father, upon the money question. Which was right and which wrong it is not necessary for us to determine. The question is, did Daniel make use of this dispute and of this circumstance to influence his father to convey the farm to him?

The only testimony of any weight which has any bearing upon it is the letters written by defendant Daniel to his father. These letters show a manifest bias against William, but it seems to me they fall far short of proving any undue influence over the mind of Robert Campbell, five or six years later, in executing the deed in question. The whereabouts of Robert were unknown, but there were John and Archibald and Nancy, who certainly had nothing to do with the taking or disposition of the money, and whatever reflections the letters contain against the actions of William certainly did not influence him against the other children I have named, as not worthy either of his gratitude or bounty.

Soon after the deed was executed these complainants filed a bill to prevent its being carried into execution, in which they took substantially the same ground which they do in this bill in this suit. Robert Campbell was made a defendant. On the thirteenth of September, 1883, he made an affidavit in that suit, as follows:

"St. Clair County—ss.

"Robert Campbell, being duly sworn, says that he is one of the defendants in the above-entitled cause, and executed

the deed referred to in the complainants' bill of complaint from Robert Campbell to Daniel Campbell, on the thirtieth day of August, 1883.

" That deponent has not heard read the complainants' bill of complaint herein, but has been informed that the complainants herein allege that said deed was so executed by deponent on account of my having been unduly influenced so to do by the other defendants, Daniel Campbell, George S. Granger, and Alexander Grant, and that deponent at the time of the execution of such deed was not of sound mind or capable of transacting business, etc.

" That in so far as any statements are made in said bill of complaint that deponent was unduly influenced, or influenced at all, in his action and purpose in making said deed by the said Daniel Campbell, George S. Granger, or Alexander Grant, collectively or individually, the same are entirely without foundation, and untrue; that deponent in so doing did what he had intended to do for a number of years, and particularly since an occurrence whereby depondent lost, very soon after his last wife's death, fourteen hundred dollars in money, and a large share of his household goods, bedding, etc., the same being taken from his house, as deponent believes, by or through the instrumentality of the complainants and other of his children.

" That, in addition to this occurrence, there were many other reasons which operated upon defendant's mind, and led him of his own accord, and solely upon his own judgment, to make such deed.

" That deponent several times, and as long as three or four years ago, proposed to said Daniel to do what he has now done; but, on account of the conduct and talk of complainants, as said Daniel informed me, he did not want to make such arrangement, although deponent had not abandoned his intention of giving to his son Daniel his property, to wit, said farm, or in any manner or to any extent changed his feelings towards complainants and others of his children; being in good health, and able without much discomfort to manage his own affairs, deponent simply postponed the doing of what he had so made up his mind to do long ago.

" That for a short time, comparatively, before the execution of such conveyance, deponent began to suffer from a cancer, and, being quite aged and requiring constant care, he determined upon inducing his son Daniel and his wife to undertake to care for him, and proposed the arrangement, which was closed on the thirtieth of August, 1883, by the execution of the deed aforesaid.

"That deponent, up to the time of the execution of said deed, had always managed and transacted his business, and always felt competent to do so, and believes fully that he was competent to dispose of his property, and knows that he did dispose of it as he desired to do, and as he had long ago decided he would do when he came to disposing of it; and deponent knows that if he was ever of sound mind, and capable of attending to his own business or to dispose of his own property, he was at the time he executed said deed, and still is.

"That soon after the execution of said deed deponent was taken worse, and deponent was for a time confined to his bed; but notwithstanding he is in feeble health, and has suffered considerably, he has known what was going on and what he was doing, and has always since such time fully realized what he had done, and is entirely satisfied with his action in so doing.

"That deponent made no disposition of his personal property, and still owns the same, but is desirous of disposing of the same, and converting it into money, and to that end has requested his son Daniel to so dispose of the same, he not having been, on account of his health, able to look up customers for his property, or otherwise look after its sale, and has consulted with his neighbor Alexander Grant, and requested him to assist him in so disposing of the same.

"That deponent expected to make use of a portion of such money for his own benefit, and to assist his son, who has not, so far as deponent knows, the means of successfully operating said farm without assistance from him, which deponent promised when he undertook to care for deponent.

"That said property was all acquired by deponent's own labor and exertions, and he had supposed he had a perfect right to dispose of it as to him seems best, and, under such impression and belief, has done what he has done and proposed.

his<br>
"ROBERT X CAMPBELL.<br>
mark.

"Subscribed and sworn to before me, September 12, 1883.
        "Albert Stephenson,
                "Notary Public, St. Clair Co., Mich.

"Witness, as to signature and mark of Robert Campbell:
                        "Daniel G. Gleason."

Two medical witnesses were examined as to his mental condition on the same day, and although not experts in mental diseases, testified that he was of sound mind.

While it is true that the language employed in the affidavit is that of the attorney who drafted it, yet it was read over to him, and he appeared to comprehend it, and duly verified the same. If it is entitled to any credit as expressing his act and intention, it ought to be an end of the case. It is certainly corroborated by other evidence as to his intentions, and also as to the delivery of the deed, and the reasons stated for giving the property to Daniel are in consonance with all the testimony.

It follows that the decree of the circuit court must be affirmed.

The other Justices concurred.